January Term, 1862.

GANSON et al. v. MADIGAN.

---

### GANSON and others vs. MADIGAN.

The defendant ordered a reaper, to be warranted in certain respects, and to be delivered to him, on &c., at M., to the care of D. & Co. When he called for the reaper at the time and place specified, he was shown the separate pieces of a large number of reapers of identical form and size, and was told by D. & Co. that one of them was designed for him, and that they would put one up for him if he would take it; but he refused. In an action by the manufacturers for the contract price, it was *held*, that if the machines were such as the order called for, the plaintiffs, having been ready and willing to perform the contract on their part, would have been entitled to compensation for any actual loss or expense which they had incurred in consequence of the defendant's refusal to take one of them; but that there was no such delivery of any machine as vested the title in the defendant and entitled the plaintiffs to recover the *contract price*.

If the plaintiffs had at the proper time set apart for the defendant, so as to make it capable of identification, a machine answering to the order, they might, on his refusal to accept it, either have sold it, with due precautions, to satisfy their lien for the purchase money, and then have recovered any unpaid balance of the price; or have held it subject to the defendant's order, and recovered the whole contract price.

The contract contained a warranty that the machine furnished should be "capable, with one man and a good team, of cutting and raking off * * from

twelve to twenty acres of grain a day." *Held*, that although the ambiguity
in the contract, arising from the use of the word *team* (which may designate
either one or more pairs of any kind of draught animals), is a *patent* ambiguity, yet it is of such a nature that it may be explained by oral evidence of the
circumstances which attended the making of the contract; and it was not
error for the court to admit in evidence declarations of the plaintiffs' agent
who procured the order, made to the defendant at the time the order was
given, as to the amount of power which the machine would require.

It was error for the court to admit in evidence upon this point, similar declarations made about the same time by the same agent to another person of whom
he obtained a similar order.

Where the meaning of a written instrument is to be judged by extrinsic evidence,
the construction is usually a question of fact for the jury; and the court did
not err in this case in submitting it to the jury to determine the sense in
which the word *team* was used by the parties.

A judgment will not be reversed on account of the admission of improper evidence, where it appears that the verdict must have been the same if such
evidence had been rejected.

APPEAL from the Circuit Court for *Dodge* County.

This was an action to recover the price of a reaping machine alleged to have been delivered by the plaintiffs to the
defendant upon his written order. For a statement of the
contract on which the action was founded, and of the facts
upon which the plaintiffs relied to show a fulfilment on their
part, see 13 Wis. Rep., 67, 68. On the third trial of the
cause at the circuit, the evidence was substantially the same
as on the previous trials, except the following:

The defendant, as a witness in his own behalf, said: "The
man who brought the order to me said he was a reaper agent
of the plaintiffs. He came to me and read a piece of paper
which said that a man with a good team was able to cut
from twelve to twenty acres of grain in a day, and lay the
same in gavels for binding." Question: "At the time you
signed this order, what did the agent say as to what kind of
a team it would take to work this reaper up to the terms of
the warranty, from twelve to twenty acres in a day?" Objected to by the plaintiffs, and objection overruled. Answer:
"The agent said that one span of horses such as I owned
would do it. This was before I signed the order." The
witness also testified, under objection from the plaintiffs:
"I told the agent [before signing the order] that if the team
I owned would not work this reaper one day with another,

January Term, 1862.

GANSON et al.
v.
MADIGAN.

I would not have it; that the team should not be changed to work the reaper up to the warranty. He said they would. I told him they were a common farmer's team; there might be better and might be worse teams; that I had but one span of horses. He said mine would do it. Mr. Gunn got a reaper that year. The agent came from Gunn's to me." Geo. C. Gunn, as a witness for the defendant, after testi-. fying that he had ordered a reaper of the same kind, and through the same agent as the defendant, and that he had got one of the lot sent to Dousman & Co., at Milwaukee, for delivery, &c., was asked by the defendant: "Did the agent, at the time he took your order, make any statement to you as to the power it took to use them, or to use the machine of 1855?" An objection by the plaintiffs was overruled, and the witness answered: "He said they could be used with two horses." Benjamin Chase, the agent through whom the order in question was given, was examined as a witness for the plaintiffs, and said: "I spoke to the defendant about buying a reaper, and read to him the order. I do not re-member what was said about the team, further than what is in the order; I think he said he had but one team, and I told him that one good team would work the machine. De-fendant said he had as good a team as any man. I have no recollection of saying to him that his team could work the reaper, one day with another, so as to cut from twelve to twenty acres in a day. There was nothing said to my knowledge about a team, further than that a good team would work it. I have seen a good many of them work, and have seen them work with a team."

In giving instructions to the jury, the judge said : "After an examination of all its parts, the contract between the par-ties in this action is ambiguous; and your first duty will be, to ascertain, from the contract and from oral evidence which has been received to explain it, what this contract really means. You are to construe the term "a good team," as used by the parties in this contract, and find from all the evidence on that subject, whether it means a good two horse team, or if not, what kind of team it does mean. If you find that the plaintiffs did deliver a machine according to agree-

ment, then they are entitled to recover whatever dama-
ges they have sustained by the defendant's refusal to receive.
The rule of damages is the difference between the contract
price and the actual value of the reaper on the 1st of July,
1855, the day specified for the delivery, together with any
expenses incurred by the plaintiff." At the request of the
defendant, the judge also instructed the jury "that if the
machine did not answer the terms of the order as to capacity
and power, the defendant was not obliged to take it; it be-
ing a condition precedent to the reception of the machine
and the payment of the $50 mentioned in the order, that the
plaintiffs should manufacture and deliver or offer to deliver,
for defendant, a machine of the power and capacities desig-
nated in the order. If the jury believe from the testimony,
that the *team* referred to means one good pair of horses, and
that the reaper furnished at Dousman & Co.'s, July 1, 1855,
for the defendant, was a four horse machine, and required
four horses to work it up to the warranty of twelve to twen-
ty acres a day, the defendant was under no obligation to re-
ceive it. If the jury believe that the words "good team"
mean two horses, and that it is proved that these machines
could not be operated with two horses up to the warranty at
all reasonable times, then the verdict must be for the defend-
ant. The fact that said machines were occasionally opera-
ted with two horses, is not sufficient proof to establish that
the capacity of the machine was equal to the warranty."

The plaintiffs requested the judge to give the following
instructions, all of which were refused: "1. If the jury believe,
from the evidence, that the plaintiffs fulfilled the contract on
their part, by the manufacture of a reaper and the delivery
of the same to Dousman & Co., on or before the 1st of July,
1855, as called for by the contract, the plaintiffs are entitled
to recover in this action the contract price, with interest.
2. That it was not necessary that the plaintiffs should
mark or set apart any particular reaper for the defendant, to
entitle them to recover the contract price; that if the jury
believe, from the evidence, that the plaintiffs manufactured
and delivered to Dousman & Co., for the defendant, on or
before the first day of July, 1855, such a reaper as the con-

January Term,
1862.

Ganson et al.
v.
Madigan.

tract called for, the plaintiffs performed the contract on their part, and are entitled to recover the contract price, with interest, though the reaper for the defendant was not separated from other reapers sent to Dousman & Co. by the plaintiffs, or any particular reaper tendered to the defendant. 3. That this action is brought to recover the contract price of the reaper; and if entitled to recover at all, the plaintiffs are entitled to recover therein the contract price, with interest. 4. That if the plaintiffs, on or before the 1st day of July, 1855, delivered to Dousman & Co., for the defendant, a reaper of the kind ordered, and such an one as the contract called for, the title to the reaper so delivered vested in the defendant. 5. That whatever may be the verdict of the jury in this action, the defendant, upon the pleadings, is entitled to the possession of the reaper, and may call at Dousman & Co.'s and demand and receive the same."

Verdict and judgment for the defendant.

*Conger* & *Hawes*, for appellants, contended that the word "team," as used in the contract, has a definite and certain meaning, accorded to it by lexicographers and common usage, viz: "Two or more horses, oxen or other beasts, harnessed together to the same vehicle, for drawing;" there was therefore no *patent* ambiguity; and there being no evidence to show that the team had by custom or usage acquired a doubtful or technical meaning, there was nothing to show a *latent* ambiguity. 1 Greenl. Ev., §§ 277, 295, 297–300; 2 Parsons on Con., 73–78; 1 Phil. Ev. with C. & H.'s Notes, 531; 2 C & H.'s Notes, 1358–1362; *Paine vs. McIntier*, 3 Mass. R., 69; *Mann vs. Mann*, 1 Johns. Ch. R., 232; 14 Johns. R., 1. 2. If the contract is ambiguous, the ambiguity could be explained only by proof of surrounding circumstances attending the contract and independent of the declarations of the parties. The declarations of the agent, made at the time the order was signed, were therefore not proper evidence to explain what kind of a team was intended. 1 Greenl. Ev., §§ 282, 288–300; 2 Parsons on Con., 77, note Z; 2 Cowen's Treat., 953; 1 Phil. Ev., 538; 2 C. & H.'s Notes, 1383, Note 948; *Comstock vs. Van Deusen*, 5 Pick., 163; *Farrar vs. Ayres*, id., 405, 409; *Wade vs. How-*

*ard*, 6 id., 492, 500 ; *Mann vs. Mann*, 14 Johns, 1. And the ambiguity, being patent, was to be determined by the court alone, without the aid of extrinsic evidence. 1 Greenl. Ev., *ubi supra*; 14 Johns. R., 1; *Cole vs. Clark*, 4 Chandler, 29 ; *Ranney vs. Higby*, 5 Wis., 62. Counsel also contended that the language of the warranty did not refer to what the machine would *ordinarily* do, with ordinary usage, but to what it *could be made* to do, by the use of extraordinary force if necessary; and that the words " a good team " should therefore be understood to mean such a team as might be necessary to put in use the warranted power of the machine, 3. The court erred in its instructions as to the measure of damages. If there was a substantial performance of their contract by the plaintiffs, they are entitled to recover the contract price, with interest. Story on Sales, §§ 315, 436 ; *Comfort vs. Kiersted*, 26 Barb., 472 ; Sedgw. on Dam., 282 ; 2 Parsons on Con., 483 ; 1 Cow. Treat., 98, 99 ; *Crookshank vs. Burrell*, 18 Johns., 58 ; *Mixer vs. Howarth*, 21 Pick., 205 ; *Bement vs. Smith*, 15 Wend., 493 ; *Shannon vs. Comstock*, 21 Wend., 457.

*Smith & Ordway*, for respondent, as to the admissibility of the evidence to show what the parties intended by " a good team," cited 2 Parsons on Con., pp. 69 note (s), 70, 71, and 76-78 note (z); 1 Greenl. Ev., 280, 288, 291, note 2 ; 1 Story's Rep., 574; 13 Mass., 142 ; 9 Watts, 9. The declarations of the agent constituted part of the *res gestœ*. 1 Greenl. Ev., § 113. Where there is a latent ambiguity, the construction is both for the court and jury. 2 Parsons on Con., p. 4, note B ; Chitty on Con., 72, 73, 765, A, and 767, note 3. It was necessary that the plaintiffs should have set apart or designated a particular reaper for the defendant, to enable them to recover the contract price. 2 Cow. Treat., 246-7, 3d Ed ; 19 N. Y., 333.

*By the Court*, DIXON, C. J. In cases like this, we fully   May 15. concur with Judge BRONSON in saying, that " it is an elementary principle that an erroneous decision is not bad law —it is no law at all ;" and could we become satisfied that our last decision (13 Wis., 67) was in this unfortunate pre-

dicament, or was an unauthorized *dictum*, we should hasten with alacrity to retrace our steps. Subsequent investigations have only confirmed the views which we there took of the law. The rights and liabilities of the parties under the contract were, in substance, these: The plaintiffs were bound to manufacture and deliver the machine in the manner specified, at the city of Milwaukee, on or before the first day of July. The defendant was bound, on the same day (or before, if notified of its earlier delivery, and he chose to do so), to be present to receive it, and pay the fifty dollars and the storage. The obligation of the plaintiffs to manufacture and deliver, and that of the defendant to be present and receive and pay, were mutual and concurrent. The presence of both parties, by themselves or agents, at the time and place designated, was necessarily contemplated, since the obligations resting upon them respectively could not otherwise be discharged. The plaintiffs, if they had manufactured and furnished ready for delivery by their agents at Milwaukee, such a machine as the contract called for, would have so far performed the duty imposed upon them as to be entitled to damages for the defendant's violation of duty in neglecting to be present, accept and pay the sums stipulated. For this purpose it was not necessary for them to set apart the machine so as to vest the title in him subject to their lien for the purchase money and charges. Having manufactured and forwarded the machine upon the faith of his promise to receive and pay for it, it would be most unreasonable and unjust to say that they should not have compensation for any actual loss or expense which they had thus incurred. The defendant, by his failure to appear and perform the contract on his part, would have been in no situation to insist upon an actual delivery or separation of the machine. Delivery and payment were concurrent acts, the one dependent on the performance of the other, and the neglect of the latter effectually excused the former. It would have been enough to have enabled the plaintiffs to recover their actual loss and expenses, if they had shown that they were *ready* and *willing* to perform the contract on their part. Chitty on Con., 633. As stated by Mr. Parsons (2 Parsons on Con., 484), they had,

under the circumstances, three courses open to them; to consider the machine as their own (which they did, by not setting it apart, so as to constitute a delivery), and sue for the damages occasioned by the non-acceptance; or to consider it as the defendant's (which they might have done, by separating it from the others so as to be capable of identification), and sell it, with due precaution, to satisfy their lien on it for the price, and then sue and recover only for the unpaid balance of the price; or in the latter case, also, to hold it subject to the defendant's call or order, and then recover the whole price which he agreed to pay. We deem these principles to be sound and well supported by the authorities, and are willing to stand by them. The rule of damages given by the court below was therefore correct, and the judge was right in refusing the instruction asked by the appellants on that subject.

The case is clearly distinguishable from those in which the counsel suppose a different rule was established. They will all be found, on examination, to have been cases where the articles purchased or manufactured were, from their nature, susceptible of being distinctly known and identified, or where they were set apart by the vendors, so that the vendees, on paying the price, could receive and dispose of them if they desired. Such was the case of the wood work of the wagon, in *Crookshank vs. Burrell*, 18 Johns., 58; the carriage, in *Mixer vs. Howarth*, 21 Pick., 205; the sulky, in *Bement vs. Smith*, 15 Wend., 493; and the promissory note, in *Des Arts vs. Leggett*, 16 N. Y., 582. As was decided in the last case, the vendor, choosing to go for the price, becomes, after a valid tender of the chattel in performance of the contract, a bailee for the vendee. But we know of no principle of law which would allow the vendor to keep the goods as his own, and at the same time come upon the vendee for the price—compel the latter to pay for, and yet not get the property; which would be the case were the present plaintiffs to be permitted to recover the price irrespective of the amount of damages which they had sustained in consequence of the defendant's non-acceptance. The machine here was brought to Milwaukee in pieces, its several parts separated and pack-

ed with those of a great number of other machines of identical form and pattern, so that the same part of one machine was equally suited to every other. It remained in this condition until after the day fixed for its delivery and acceptance. It is idle, therefore, to talk about there having been such a delivery as would have vested the title in the defendant, provided the jury had found that the machine was such as the contract called for. The property in all the machines remained in the plaintiffs, subject to their absolute dominion and right of disposal. Nothing could have changed it as to the defendant, short of a separation or distinct ascertainment, by mark or otherwise, of the machine intended for him, so that he could afterwards, on paying the price, have obtained it if he chose.

If the defendant's had been the only contract for a machine to be delivered in Milwaukee, and his the only machine delivered, or if it had been unlike all the others, the question would have very different. The authorities cited by counsel would then have afforded some foundation for their position.

And here we may correct another mistake on the part of the counsel. They seem to suppose that the delivery of several machines in Milwaukee, in whatever form, so that *one* could have been obtained by the defendant within the time prescribed, was all that was necessary under the contract to pass the title; and that this court so decided when the cause was here for the first time. 9 Wis., 146. But this was not so. The delivery there spoken of was a delivery in the general sense of bringing the machine to Milwaukee, in pursuance of the contract, so as to entitle the plaintiffs to recover damages for the defendant's non-acceptance,—not that specific delivery made necessary by law, to transfer title. The contract of the defendant was distinct and independent of that of every other person, and a compliance with its terms, as well as the law, required a distinct and independent delivery, in order to vest the title in him. He never agreed to receive his machine in fragments, commingled with those of the machines of a hundred other persons, in such manner that nothing could be identified. The way in which the ma-

chinés came to the hands of the consignees, was the plaintiffs' fault, or at least, not the fault of the defendant.

The word "team," as used in the contract, is of doubtful signification. It may mean horses, mules or oxen, and two, four, six or even more of either kind of beasts. We look upon the contract and cannot say what it is. And yet we know very well that the parties had some definite purpose in using the word. The trouble is not that the word is insensible, and has no settled meaning, but that it at the same time admits of several interpretations, according to the subject matter in contemplation at the time. It is an uncertainty arising from the indefinite and equivocal meaning of the word, when an interpretation is attempted without the aid of surrounding circumstances. It appears on the face of the instrument, and is in reality a patent ambiguity. The question is, Can extrinsic evidence be received to explain it? We think it can. There is undoubtedly some confusion in the authorities upon this subject, especially if we look to the earlier cases; but the later decisions seem to be more uniform. As observed by Chancellor DESAUSSURE, in *Dupree v. McDonald*, 4 Des., 209, the great distinction of *ambiguitas latens*, in which parol evidence has been more freely received, and *ambiguitas patens*, in which it has been more cautiously received, has not been sufficient to guide the minds of the judges with unerring correctness; some of the later cases show that there is a middle ground, furnishing circumstances of extreme difficulty. Judge STORY was of opinion (*Reisch v. Dickson*, 1 Mason, 11), that there was an intermediate class of cases, partaking of the nature both of patent and latent ambiguities, and comprising those instances where the words are equivocal, but yet admit of precise and definite application by resorting to the circumstances under which the instrument was made, in which parol testimony was admissible. As an example, he put the case of a party assigning his *freight* in a particular ship by contract in writing; saying that parol evidence of the circumstances attending the transaction would be admissible, to ascertain whether the word "freight" referred to the goods on board of the ship, or an interest in the earnings of the ship. This distinction seems

January Term,
1862.

GANSON et al.
v.
MADIGAN.

to be fully sustained by the later authorities, and we can discover no objection to it on principle. *Reay v. Richardson,* 2 C., M. & R., 422; *Hall v. Davis,* 36 N. H., 569; *Emery v. Webster,* 42 Maine, 204; *Baldwin v. Carter,* 17 Ct., 201; *Drake v. Goree,* 22 Ala., 409; *Cowles v. Garrett,* 30 Ala., 348; *Waterman v. Johnson,* 13 Pick., 261; *Mech.'s Bank v. Bank of Columbia,* 5 Wheat., 326; *Jennings v. Sherwood,* 8 Ct., 122; 1 Greenl. Ev., §§ 286, 287 and 288. The general rule is well stated by the Supreme Court of New Hampshire, in *Hall v. Davis,* as follows: " As all written instruments are to be interpreted according to their subject matter, and such construction given them as will carry out the intention of the parties, whenever it is legally possible to do so, consistently with the language of the instruments themselves, parol or verbal testimony may be resorted to, to ascertain the nature and qualities of the subject matter of those instruments, to explain the circumstances surrounding the parties, and to explain the instruments themselves by showing the situation of the parties in all their relations to persons and things around them. Thus, if the language of the instrument is applicable to several persons, to several parcels of land, to several species of goods, to several monuments, boundaries or lines, to several writings, or the terms be vague and general, or have divers meanings, in all these and the like cases, parol evidence is admissible of any extrinsic circumstances tending to show what person or persons, or what things, were intended by the party, or to ascertain his meaning in any other respect; and this without any infringement of the general rule, which only excludes parol evidence of other language, declaring the meaning of the parties, than that which is contained in the instrument itself."

If evidence of surrounding facts and circumstances is admitted to explain the sense in which the words were used, certainly proof of the declarations of the parties, made at the time, of their understanding of them, ought not to be excluded. And so it was held in several of the cases above cited. 2 C., M. & R., 422; 42 Maine, 204; 13 Pick., 261. Such declarations, if satisfactorily established, would seem to be stronger and more conclusive evidence of the intention of

the parties than proof of facts and circumstances, since they come more nearly to direct evidence than any to be obtained, whilst the other is but circumstantial.

And though in general the construction of a written instrument is a matter of law for the court—the meaning to be collected from the instrument itself; yet, where the meaning is to be judged of by extrinsic evidence, the construction is usually a question for the jury. *Jennings v. Sherwood*, and other cases above. The circuit judge was therefore right in receiving parol evidence to ascertain the sense in which the word was used by the parties, and in submitting that question to the decision of the jury.

But he was clearly wrong in receiving evidence of the statements of the plaintiffs' agent to the witness Gunn, at the time of making the contract with him. The occasions were different—the two contracts entirely disconnected, and though both concerned a machine of the same pattern and manufacture, yet what was said in the one case was not a part of the transaction in the other. It was no part of the *res gestæ*. If the agent Chase, in negotiating with Gunn, had made an admission of his representations to the plaintiff, evidence of such admission could not have been received. *Mil. & Miss. R. R. Co. v. Finney*, 10 Wis., 388. It would be going much too far, were we to hold that it was proper to give the jury the agent's statement to Gunn, as evidence tending to prove that a similar statement was made to the plaintiff. If it has any such tendency, it is so remote that the law cannot lay hold of and apply it.

The question then comes up, Must the judgment, for this reason, be reversed? The defendant's counsel insist not—that the evidence before the jury was sufficient without this, and if it had been rejected, the verdict must have been the same. We are inclined to take the same view. The defendant's testimony was clear and positive as to the kind of team—that the agent said " one span of horses " would work the machine up to the warranty. In this he was not contradicted, but rather corroborated by the agent, who was himself upon the stand. We would naturally expect, if the fact had been otherwise, the agent would have said so. On the

other hand, he testifies very frankly that the defendant said he had but one team; and that he told him one good team would work the machine. The admission of the improper evidence could not, therefore, have affected the finding of the jury upon this point; and consequently the plaintiffs were not prejudiced by it.

We can hardly believe that the argument of the plaintiffs' counsel upon the construction of the warranty, that it referred to the capacity of the machine without regard to the kind of team employed, and was satisfied, if, under any circumstances, and with any number of horses, it could be made to perform as alleged, was urged with any real hope of success. Such a construction would be directly opposed to the manifest intention of the parties.

The jury, upon proper evidence and under proper instructions, having found that the machine delivered at Milwaukee was not such as the contract called for, the judgment upon their verdict must be affirmed.

Ordered accordingly.