The Janesville Cotton Mills and others vs. Ford and another.

THE JANESVILLE COTTON MILLS and others, Respondents, vs. FORD and another, imp., Appellants.

*December 22, 1891 — June 15, 1892.*

*Partition of water-power: Construction of deeds: "Square inches of water:" Practical construction by parties: Ownership of dam by grantees of the use of water.*

1. The owners of a water-power made from time to time several grants, each conveying the perpetual use of a specified number of square inches of water under a head of four feet, or its equivalent under any other head. In a subsequent action for partition of the water-power, it is *held*, upon the evidence, that the term "square inch of water" had not in 1860 (prior to which time the earlier conveyances were made) acquired, even among hydraulic engineers and mill-men, the fixed technical meaning of a stream of water with a cross-section area of one square inch, moving with the velocity due to the given head. The grants are to be construed, therefore, in the light of the surrounding circumstances and the practical construction placed upon them by the parties.

2. An agreement for the management and regulation of the water-power and its use had been entered into by all of the then owners of the water, pursuant to which an engineer had been appointed who, acting for all and without objection or complaint, for several years regulated the use of the water by each owner, measuring and giving to each the number of inches owned by him, taking as a standard a stream having a cross-section area of a full square inch and moving with the velocity due to the head. No different rule

was ever used for measuring the water to the parties. *Held*, that this practical construction, by all the parties then interested, of the term "square inch of water" in the conveyances, being reasonable and definite, must be taken as the true construction of that term.

3. In each conveyance of the use of water by the original owners was a reservation of water sufficient to drive six run of millstones, and each grantee covenanted to pay his share in keeping in repair the dam and raceway, in proportion to the number of square inches of water used by each. The grantors represented that the amount so reserved was 3,200 inches under a head of four feet, and that was always treated by all parties interested as the amount of the reservation, and all the numerous assessments for repairs, etc., were made on that basis. It also appears that that amount was and is sufficient for the purpose specified. *Held*, that the water reserved was 3,200 square inches and no more.

4. The dam was not built by the primary owners to a height sufficient to produce a head greater than four feet. After the conveyances were made the dam was frequently enlarged, improved, and raised, until at the time of the action for partition it produced a head of at least seven feet. All this was done at large expense by the grantees of the water and the owners of the reserved water, each paying according to the number of inches he owned, the reserved water being reckoned as 3,200 inches. The several quantities of water conveyed, together with the 3,200 inches reserved, aggregate 13,532 inches, and the whole quantity of water at the dam does not exceed that amount, though at the increased head of seven feet it furnishes power in excess of that furnished by 13,532 inches at the head of four feet specified in the conveyances and reservation. The owners of the water conveyed and of that reserved have always treated each other as the owners of the dam and all its power in proportionate shares, and have always used the water on that basis, each using the number of inches to which he was entitled under whatever head the dam at the time afforded. *Held*, that the excess of power over that furnished by 13,532 inches at a head of four feet, created by enlarging and raising the dam, does not belong to the successors to the title of the primary owners, but that the several owners of the perpetual use of the water have become the sole owners, as tenants in common, of the dam and the entire power in proportionate shares, according to the number of inches owned by each.

APPEAL from the Circuit Court for *Waukesha* County. This is an action brought under the provisions of secs.

3149–3153, R. S., for the partition of the water-power created by the dam in Rock river at Janesville, among the several owners, all of whom are made parties to this action. The complaint was sustained upon demurrer by this court in 55 Wis. 197. Since that decision the action has been tried upon the merits, and is now here upon appeal from final judgment.

In 1845 A. Hyatt Smith and W. H. H. Bailey commenced the construction of the dam in question, being then the owners of the land on which the dam is situated. Said dam was constructed and maintained under the provisions of an act of the territorial legislature, approved April 6, 1843 (Laws of 1843, p. 25), as amended by an act approved January 27, 1846 (Laws of 1846, p. 116), and by ch. 353, P. & L. Laws of 1855. The first of said acts authorized the raising of the dam to such a height as to afford a fall of two feet nine inches; the second act authorized a height giving a fall of four feet; and the third act an elevation giving a fall of eight feet in ordinary stages of water. In 1847 the land, dam, water-power, and an appurtenant canal or raceway were all owned by Smith, Walker, and J. B. Doe in individual shares; Smith owning five eighths, Walker one fourth, and Doe one eighth thereof. The dam had then been so far constructed as to afford a head of about four feet. It was made of brush, stone, and timber, and was not very substantial, and allowed considerable water to flow through it. During the year 1847 Smith, Walker, and Doe completed and put in operation a flouring mill at the south end of the canal, equipped with six run of burr millstones and eight water wheels, which wheels were supposed to be of the capacity to admit of the passage of 400 square inches of water through the issues of each. This mill is constantly referred to in this litigation as the "Big Mill." The circuit court found, upon conflicting evidence, that Smith, Walker, and Doe, the primary owners

of the dam, spent not exceeding $10,000 in constructing the same, and that they did not at any time construct or add to the same so as to afford a greater head than four feet, but that the subsequent additions and repairs to the dam, by which a greater head of water, *i. e.,* about seven and one-half or eight feet, was subsequently secured, were made and paid for by persons to whom the perpetual use of specific quantities of water was afterwards conveyed by said primary owners, and by the owners of certain water reserved for the use of the "Big Mill."

In May, 1847, Smith, Walker, and Doe contracted in writing to convey to A. B. and E. M. Jones a lot upon the water-power, "together with the perpetual use of 1,200 square inches of water under a head of four feet, or its equivalent under any other head." The contract also reserved to the primary owners, their heirs and assigns, as an equal right, "water sufficient, judiciously applied, to drive six run of millstones, to be used for such purposes as to them may seem proper." There was also a covenant by the primary owners to finish the dam and raceway so as to afford a head of four feet; also a covenant by the parties of the second part "to pay their share towards keeping in repair the dam and raceway in proportion to the number of square inches of water by them used." By oral agreement 300 square inches of water was soon after added to this contract, and A. B. and E. M. Jones having assigned the contracts to others, a deed was made July 9, 1850, to such assignees in fulfilment of the contracts, conveying said 1,500 square inches of water, with the same conditions, reservations, and covenants contained in the original contract with A. B. and E. M. Jones. By mesne conveyances the title to this 1,500 square inches of water has vested in Pliny Norcross, subject to substantially the same conditions, reservations, and covenants.

This sale of a specified number of square inches of water

was followed by numerous other sales and conveyances of the perpetual use of specified quantities of water. The conveyances run through a long series of years. They are all founded on the Smith, Walker, and Doe title; they all convey water by square inches under a four-foot head, with only one material exception. This exception is contained in a deed made February 27, 1849, by Smith and Doe to Stevens and Older, which conveys "550 square inches of water to be drawn through an aperture of that capacity under a head of four feet, or water sufficient under any other head to produce the same power." The title to this 550 inches has now vested in the plaintiff the *Janesville Cotton Mills*. In many of the conveyances the grant is of so many inches under a four-foot head, "or sufficient water under any *greater* head to be equivalent thereto in power." The reservation of water sufficient, judiciously applied, to drive six run of millstones, is repeated in substantially the same terms in all the deeds from the primary owners or their successors in the ownership of the "Big Mill." This reserved water is referred to in the testimony as the "Big Mill Water." The covenant to repair ratably in proportion to the amount of water used is contained in substantially the same terms in all the deeds.

In 1851 the first repairs were made upon the dam by the levying of ratable assessments upon the owners of water to the amount of about $5,000, and after this time numerous repairs were made during the ensuing years, which were paid for by like assessments which were made, collected, and expended up to the year 1866 by or under the direction of A. Hyatt Smith, and the circuit court found that it was by means of the moneys raised by these *pro rata* assessments since the year 1855 that the dam and race were enlarged, improved, and raised so as to afford all of the head of water in excess of four feet which has ever existed at said water-power, and that the aggregate sum

so raised by assessment and expended exceeds $50,000. The court also found that the dam and race were now about double the width and height of the original dam and race, and were permanently and substantially constructed; that little, if any, of the original dam now exists; and that all of the expense of such additions and improvements to the dam and race has been defrayed from the *pro rata* assessments made from time to time. These assessments have been made uniformly by taking the aggregate amount of inches of water sold and that reserved for the "Big Mill," and dividing the expense proportionally among the owners of water according to the amount owned by each. In making these assessments no attention has ever been paid to the fact that the head has been increased from four to eight feet, and the amount of the reserved or "Big Mill" water has always been placed at 3,200 inches. The court also found that the primary owners have at all times represented that the reserved or "Big Mill" water amounted to 3,200 square inches, and the court found also that 3,200 square inches of water at a four-foot head was in fact sufficient to drive six run of millstones with necessary machinery, and that 3,200 square inches was in fact the amount reserved for the "Big Mill" under the reservation clause contained in the conveyances by the primary owners. The "Big Mill," so called, was destroyed by fire in 1871, and the reserved or "Big Mill" water has been sold in parcels aggregating 3,200 square inches; the plaintiff cotton mills now owning 2,550 square inches and the balance being divided among a number of the parties to this action. The total number of square inches of water, including the 3,200 inches of "Big Mill" water, which has been sold and conveyed, is 13,532, all of which is owned by the parties hereto.

Differences arose between the various owners of water rights, especially between the appellants, *Ford* and *Crossett*, on the one side, and the remaining owners upon the other

side, as to the amount of water furnished by the dam, the amount of the reserved or "Big Mill" water, and the method of measuring or regulating the consumption of water, and in consequence of such differences this action was brought in the year 1881 to obtain a judicial determination of the rights of all the owners of water rights, and for the appointment of commissioners to ascertain and report the amount of water supplied by the dam, the head which should be maintained, the best mode of measuring the water, the basis of apportionment of the expenses of maintaining the dam and power, and to report to the court. During the course of the litigation Edward Ruger and George A. Houston were appointed as commissioners under the prayer of the complaint, and made report as to the most feasible method of measuring the water and the proper basis of apportionment of the expenses of measurement of water and maintenance of the power. After a long trial, findings and judgment were entered which were in the main adverse to the claims of the appellants, *Ford* and *Crossett*, and from such judgment this appeal was taken.

Further facts will be found stated in the opinion.

For the appellants there was a brief by *A. A. Jackson*, attorney, and a supplementary brief by *Jackson & Jackson*, attorneys, and *I. C. Sloan*, of counsel, and the cause was argued orally by *A. A. Jackson* and *I. C. Sloan*.

For the respondents there were briefs by *William Ruger*, and oral argument by *Mr. Ruger* and *Mr. John Winans*.

WINSLOW, J. The trial of this case was very long. The record before us contains nearly one thousand printed pages. We have carefully examined it, and are satisfied that the findings of the circuit judge upon those questions in the case which are purely questions of fact are amply sustained by the evidence. We shall not discuss them at length. This general statement of our conclusions must suffice.

The legal questions at issue are neither numerous nor dif-
ficult of statement.   Without attempting to quote the lan-
guage of the findings and judgment in full, it may be briefly
stated that the circuit court adjudged, *first*, that the term
" square inch of water," as used in the conveyances in evi-
dence, means " a volume or stream of water one inch square
in cross-section area measured at right angles with the line
of its flow, and flowing with the velocity due to the given
head; " *second*, that the reserved or " Big Mill " water
amounted to 3,200 square inches and no more; *third*, that
the several owners of the perpetual use of water have be-
come the sole owners as tenants in common of the dam,
canal, and water-power, and all the rights appertaining
thereto in the proportion which the number of square inches
owned by each bears to 13,532 square inches; *fourth*, that
all the water furnished by the dam has been sold, and that
there is no excess over and above the 13,532 square inches
which has been sold in parcels.   All these findings are chal-
lenged by the appellants, *Ford* and *Crossett*, who claim that
the reserved or " Big Mill " water exceeds 3,200 square
inches, and that there is an excess of water furnished by
the dam over and above 13,532 square inches at a four-foot
head, and that they are the owners of a part of each sur-
plus.   These contentions will be considered in the order
above indicated.

I. As to the meaning of the term " square inch of water."
It is apparent that the term does not, in the ordinary and
usual sense of the words used, convey to the mind any idea
of volume.   In order to determine what it means it must
receive a construction, and the question is, What is the
construction or meaning which must be given to it?   On
behalf of respondents it is claimed, and the circuit court
seems to have followed that view, that the term " square
inch of water " had a definite technical meaning among
water engineers and practical mill-men from a time ante-

rior to the making of the first conveyance, and that such meaning was the one found by the court, namely, a stream of water with a cross-section area of one square inch, moving with the velocity due to the given head. On the other hand, it is claimed by appellants that the term had no such definite technical meaning at any time, certainly not in the early days of the water-power in question, and that the meaning of the term as here used must be sought for and found by considering the circumstances and facts surrounding the various grants and the evidence of the parties as to the meaning intended by the term, and that in the light of such facts and evidence of intention it must be held that the term means the amount of water which will be discharged through an aperture in a flume of the given number of square inches, the center of which aperture is at the given distance below the surface of the water in the flume. For convenience we will call the first the "theoretical inch;" the second, the "practical inch."

It appears from the testimony of the experts that there is a considerable difference between the theoretical and the practical inch. The theoretical inch is certain and unvarying in amount; the practical inch varies in amount according to the construction of the aperture. The practical inch discharged through an aperture with thin edges will measure about sixty-two per cent. in volume of the theoretical inch, but if the aperture be trumpet-shaped, or furnished with proper adjutage inside the reservoir, it may be made to equal the theoretical inch, and even to discharge as much as 240 per cent. of the theoretical inch. The theoretical inch is founded upon a theory, namely, the theory that water spouting from the side of a flume with a certain head, say four feet, will have the same velocity as if it fell the same distance through the air, and, as this velocity is fixed and certain, the amount of water referred to in the theoretical inch is fixed and certain. This theory is not

true in actual practice, for it appears, as has been stated, that the actual discharge through an aperture with thin edges and without adjutage is but sixty-two per cent. of the theoretical discharge; the reason being that by the crowding together of particles of water coming towards the hole from all directions the flow is retarded, and the stream does not attain its theoretical velocity until it is a short distance outside of the hole where the cross-section area becomes contracted. It is a matter of considerable importance, therefore, which of these meanings is to be applied to the term "square inch," as used in the deeds under consideration.

It needs no authority to show that if the term had a fixed and definite meaning among hydraulic engineers and mill-men at the time it was used, such meaning would prevail, notwithstanding the fact that people ordinarily did not know of such meaning, or even that the parties to the deeds themselves did not know of it. Parties cannot use technical terms with a fixed meaning, and then disclaim such meaning. It is equally clear to our minds that when such alleged technical or trade meaning is an arbitrary one, and not a meaning which the word or words would naturally import, it must clearly appear that the acquired or technical meaning was not the subject of dispute or doubt; that it was well settled and understood, at least among members of the profession or trade which is supposed to use the term in such technical sense. It would relieve us of some labor if we were able to say that the testimony here shows that the term "square inch of water" had acquired the technical meaning embodied in the definition of the theoretical inch at the time of the making of the early deeds upon this water-power, but we are not able to say so. It is true, there are several water engineers who testify that the theoretical inch has become the accepted meaning of the term "inch of water,"

but they do not attempt to tell when such meaning became prevalent. There were also some pamphlets called "wheel books," which are advertisements issued by makers of water-wheels, which give the technical definition claimed by respondents; but these have all been issued within a few years last past. There was other evidence upon the same side, but, on the other hand, there was much evidence of practical millwrights, and at least one water engineer, to the effect that such meaning has never obtained or come into general use. The entire testimony on this point forces upon our minds the conviction that there was not in 1850, or even in 1860, a fixed technical meaning attached to the words such as respondents claim. This impression is strengthened when we consider a number of decisions in this and other courts where grants of inches of water have been made and defined or explained in the grant by reference to an aperture. *Blanchard v. Doering*, 21 Wis. 477; *Norris v. Showerman*, 2 Doug. 16; *Schuylkill Nav. Co. v. Moore*, 2 Whart. 477. Did the question relate solely to deeds executed within the last decade, the respondents' argument would be much stronger.

We must, then, seek elsewhere to ascertain the meaning of the words under consideration, as the words were of doubtful signification. Doubtless the circumstances surrounding the parties at the time the grants were made, the condition of the race, the size of the apertures through which water was drawn, the capacities of the wheels used, and many other facts tending to throw light on the apparent intention of the parties at or about the time the deeds were made, should be considered upon the question. *Ganson v. Madigan*, 15 Wis. 144. There is testimony of this kind in the case, and the appellants claim that it clearly demonstrates that the practical inch is the inch which the deeds should be construed to convey. This testimony shows that in some instances the apertures of the wheels proposed

to be used were measured, and the number of inches granted was fixed thereby, also that among many practical mill-men upon Rock river the term "square inch" was understood to mean the area of the aperture. Direct testimony was also given by A. Hyatt Smith that he intended by his grants to measure the inches of water granted by the superficial area of the aperture. This last testimony was, at least, of doubtful admissibility.

Were we left with this testimony alone on the subject, appellants' contention would indeed be strong. There is, however, other testimony in the case which seems to us of greater significance in the interpretation of all the grants under consideration than that which we have just noticed, and we will briefly state what that evidence is.

In January, 1874, an equitable action was commenced in the United States circuit court for the western district of Wisconsin, by Charles D. Mead, as trustee of the separate estate of Ann M. C. Smith, against Oliver B. Ford and others, being a large majority of the then owners of the water on the power, to restrain the defendants from using more water than the plaintiff claimed they were entitled to use. Oliver B. Ford was the father of the appellants, and their rights came through him. In 1854 A. Hyatt Smith, then owning an undivided three-fourths interest in the dam and canal and the water then unsold, had executed a mortgage to secure payment of a note of $95,000 to Mead as trustee of the separate estate of his wife, Ann M. C. Smith, and it was upon his interest as such mortgage trustee that Mead based his right of action. Answers were served in the action, and in June, 1874, a stipulation was entered into by Mead and a part of the defendants, including Ford, selecting one Hiram F. Mills, a water engineer, as an expert to go to Janesville and make measurements, surveys, and tests, and thereafter to rightly answer interrogatories bearing on the controversy. In pursuance of

this stipulation Mills made his measurements and answered the interrogatories and filed his report in the latter part of the year 1874. Among those interrogatories was the following: "What is understood by a square inch of water?" and to this he answered, "The square inch of water as it is understood is the square inch of stream of water where the particles are all moving in the same direction as the axis of the stream with the velocity produced by the head." It will be seen that this is the theoretical square inch. The action was never brought to trial. In fact no further steps seem ever to have been taken. The reason was that in July, 1874, a decree was entered in an action pending in the United States circuit court for the eastern district of Wisconsin, brought by judgment creditors of A. Hyatt Smith, and attacking the Mead trust mortgage as fraudulent, which decree adjudged that the mortgage was void as to such creditors, and that the title still remained in A. Hyatt Smith, and that Smith's interest be sold by a master to satisfy the claims of such judgment creditors. It cannot be claimed, for obvious reasons, that the Mills report had the effect of an arbitration and award, though no objection or exception seems ever to have been made to it by any of the parties; but the subsequent acts of the parties render it very significant.

In March, 1875, a sale was had by a master in chancery of the interests of A. Hyatt and Ann M. C. Smith in the dam and power under the decree in the creditor's action, and the same was purchased by Oliver B. Ford on behalf of himself and a syndicate of owners of water upon this power and the Monterey water-power below, so that Smith disappeared as an owner of any part of the power.

After this sale, and in August, 1875, an agreement in writing was entered into by all of the then owners of the power, including Oliver B. Ford and *Oliver C. Ford,* for the purpose of establishing a plan " whereby the said water-

power, and the use thereof, may be judiciously managed and *regulated*, to the end that the rights and interests of the respective parties hereto may be secured and promoted." This agreement provided that the dam should at once be repaired by a committee appointed, the cost to be apportioned among the owners according to the custom theretofore practiced; that an iron bolt should be placed in the pond above the dam as a watermark below which the water should never be drawn except for the purpose of repairing the dam; that when the water in the river was insufficient to give all the owners the water owned by them (and designated in a schedule attached), then the owners of junior or servient water should cease to draw so much as may be necessary *and as shall be designated by the engineer*, until the water in the river is again sufficient to supply all; that bulkheads should be constructed at the head of each flume, and a uniform system of gates established at each flume for the delivery of water to each owner, but that if such method be abused by the parties the *engineer* should have power to regulate the use thereof; and that the engineer should have the right to enter on the premises and buildings of the parties at all times for the purpose of discharging his duties. Edward Ruger was appointed engineer in charge under the provisions of the agreement.

It will be seen at a glance that this agreement contemplated accurate measurement of the water. The schedules attached gave the number of inches of water owned by each party and the order of priority. It appears without dispute that Edward Ruger acted as engineer under this agreement for four years, and that during that entire time he measured the water and regulated its use under the terms of the agreement; that during the entire time he used as the standard of measurement what we have called the "theoretical" inch. He says: "In measuring to the owners under these schedules, I gave them a square inch measured

The Janesville Cotton Mills and others vs. Ford and another.

at right angles with its flow, issuing with the velocity of whatever head was acting upon it. . . . I did not at any time measure to them as a square inch of water a volume having a cross-section area less than a full square inch. I never heard any complaint as regards the square inch that they were too large or too small. I do not recollect hearing any complaint of the measurement of a square inch of water as defined by Mr. Mills in his report during the time I was measuring water." It does not appear that any different rule was ever used in measuring water to the parties in this case. In fact it would appear that it was never systematically measured and regulated except during the four years that Ruger acted as engineer, and it does not appear that he ceased to act as engineer on account of any dissatisfaction with the standard of measurement used by him. Here, then, during four years, was a practical construction placed by all the parties then interested upon the terms of their conveyances, and the construction so adopted, while technical and arbitrary, possessed the merit of being definite and certain, capable at all times of being ascertained with mathematical accuracy.

It is well settled that the practical construction placed by the parties in interest upon doubtful or ambiguous terms in a contract will exercise great and sometimes controlling influence in determining the construction, and such rule is founded upon manifestly just principles. *District of Columbia v. Gallaher*, 124 U. S. 505; *Topliff v. Topliff*, 122 U. S. 121; *Pate v. French*, 122 Ind. 10; *Nilson v. Morse*, 52 Wis. 240; *Hosmer v. McDonald*, 80 Wis. 54. While this rule applies with greatest force to executory contracts, it is by no means confined to that class, and in this case there is, furthermore, an element partaking of an executory nature in the conveyances, for the water sold is continually being delivered.

We have concluded in this case that the construction

The Janesville Cotton Mills and others vs. Ford and another.

which the owners of the power for years placed upon the terms of their grants, it appearing that such construction is reasonable and definite, should and must prevail. We adopt the construction which the parties have adopted, the construction which admits of no doubt as to the amount of water called for, which can always be defined and ascertained with mathematical certainty, and which seems to do justice to all parties in interest, namely, the construction that a "square inch of water," as used in the deeds in this case, means what we have termed the "theoretical square inch."

II. As to the amount of the reserved or "Big Mill" water. As will be noticed by reference to the statement of facts, there was a reservation made in all the early deeds of water upon this power of "water sufficient, judiciously applied, to drive six run of millstones and necessary machinery." The language varies somewhat in some of the conveyances, but the differences are not material. This water was reserved for the use of the "Big Mill," so called, and by means of the water so reserved the "Big Mill," with six run of stone, was operated until its destruction by fire in 1871, after which time 3,200 inches of such reserved or "Big Mill" water have been sold in parcels. If there is any excess over 3,200 inches in this reserved water the appellants are shown to be the owners of one half such surplus, and they contend that the circuit court erred in holding that the amount of the reserved or "Big Mill" water was 3,200 inches and no more.

The doctrine of practical construction is applicable with reference to this reservation as well as with reference to the grant of water. The amount reserved is not definite in amount. Different wheels will use different amounts of water, and thus the reservation cannot be said upon its face to fix any certain amount of water.

The circuit court found, and the fact seems to be, that

3,200 square inches of water at a head of four feet is now, and always has been, a sufficient amount to drive six run of millstones and necessary machinery; that the amount of such reservation has always been treated by all the parties interested as 3,200 square inches; that the primary owners at the times when the various conveyances were executed represented that the amount reserved was 3,200 inches under a head of four feet; that in all the numerous assessments made for repairing or rebuilding the dam and canal, beginning in 1851 and running down to a recent period before this suit was commenced, said reserved water has always been represented by the owners as being 3,200 square inches at a four-foot head, and has always been assessed at 3,200 inches.

Elements of estoppel would seem to be present here as well as practical construction by the parties. We think we need not extend the discussion of this branch of the case. The circuit court was plainly right in holding that the " Big Mill " water is 3,200 inches and no more.

III. As to the ownership of the dam, and as to whether there is any surplus water in the river over and above 13,532 square inches at a head of four feet. These questions are closely connected, and may best be considered together. The finding of the circuit court was that the owners of the perpetual use of water have become the sole owners, as tenants in common, of the dam and power, and that all the water furnished by the dam had been sold by the primary owners.

In holding that the owners of water rights are sole owners of the dam the circuit court undoubtedly followed the principle laid down by this court in the case of *Smith v. Ford*, 48 Wis. 115. The late Mr. Justice TAYLOR there says (p. 166) with reference to this same dam and power: " It seems clear to us that when the original owners had conveyed all the water afforded by the dam, and had re-

lieved themselves from maintaining the same by covenants requiring the grantees to maintain it, such grantees would own the same as tenants in common, each owning such proportion as his quantity of water bore to the whole quantity afforded by the dam." If there is any water in the power still unsold, the appellants, as heirs of Oliver B. Ford, are owners of an undivided one-quarter thereof, being the Walker interest, which was deeded to Oliver B. Ford in January, 1874; they also own 2300-4355 of the Smith and Doe three-fourths thereof by virtue of the purchase made at the master's sale by Oliver B. Ford. The circuit court found, upon conflicting evidence, that the river will supply for continuous use, at its ordinary stage, with its natural volume made uniform by an artificial reservoir called the "Indian Ford Dam," from eight to ten thousand square inches of water at a head of four feet, and will not supply more than 13,532 square inches at any time, unless it be for a very short period, during an unusually high stage of water. Undoubtedly, it is the amount furnished at the ordinary stage which must control in determining the capacity of the river, and accepting, as we do, this finding as settling the question as to the amount of water supplied by the river at a four-foot head, it appears at once that the entire amount has been sold, and more.

But it appears that the dam has been maintained for many years at a height which furnishes a head of between seven and eight feet. It is plain that the quantity of water necessary to produce a given amount of power is reduced as the head is increased. By the expert testimony it appears that if we call a square inch of water at a four-foot head one, the fraction of a square inch which will produce the same power under a head of seven feet is .4319. The volume of water in the river is not increased by the raising of the head, but the power furnished is largely increased. Using the rule above quoted, we find that the same power

produced by 13,532 square inches at a four-foot head will be produced by 5,844.47 square inches at a seven-foot head. The deeds of water uniformly convey a given number of square inches of water at a four-foot head, *or water sufficient under any greater head to be equivalent in power.* Under this language it is claimed by appellants that at a head of seven feet only 5,844.47 inches of water have been conveyed, and the river furnishing, as found by the court, in its ordinary volume, at least 8,000 square inches, there is an unconveyed surplus, a part of which belonged to Oliver B. Ford as grantee of the remaining rights of Walker, the primary owner of one quarter of the dam and power, and as purchaser of a part of the remaining rights of A. Hyatt Smith under the master's sale in 1875.

This claim, we are satisfied, cannot and ought not to prevail. In the first place, it is settled in the case that the dam was not built by the primary owners themselves to a height sufficient to produce any greater head than four feet. It would be a fruitless waste of time to go over the vast amount of testimony on this point; it was conflicting, and the finding of the circuit court settles the question. The increase in the height of the dam and consequent increase of head has been made at the expense of the grantees of the use of water and the owners of the reserved or "Big Mill" water in proportionate shares. The amount thus expended at various times exceeds $50,000. Time after time has the dam been partially swept away by freshets, or worn out by ordinary wear and tear, and been rebuilt, made stronger, and improved by the owners of the water rights, and without help from the primary owners, save as they contributed their proportion as owners of the 3,200 square inches of reserved or "Big Mill" water. By reason of these expenditures so made, there now exists a substantial, solid dam, giving a permanent head of at least seven feet, in place of an unsubstantial affair of brush, logs, and

stone, which allowed much water to pass through it, and afforded a head of but four feet. As has been said, the primary owners never contributed to the assessments for repairs and rebuilding in their capacity as owners of surplus water. The assessments were all made in the following manner: The amount to be expended was determined, and the rate of assessment per inch found by dividing that sum by an aggregate amount composed of the total number of square inches of water which had been sold and the 3,200 inches reserved for the "Big Mill." The rate being thus established, each owner paid his assessment according to the number of inches he owned. Now to hold that these owners of water have by their expenditures created a surplus of water which belongs to the original proprietors is manifestly most unjust and inequitable. In 1875 Oliver B. Ford possessed all the rights that the appellants now have, and he entered into the agreement for the measurement of water and regulation of the power heretofore described in this opinion. In this agreement it was recited that the parties own or claim to own the title to the water-power in question, and a schedule was attached showing the amount of water claimed by each owner, many of whom are parties to this action; but we look in vain to find any claim by Oliver B. Ford that he owned a large surplus of water over and above the amounts covered by the deeds.

The case shows that from beginning to end in the history of this power the owners of the sold water and the reserved water have invariably treated each other as the owners of the dam and all its power in proportionate shares according to the number of inches owned. They have bought, mortgaged, and sold on that basis; they have levied, collected, and expended assessments for repairs and rebuilding on that basis; they have always used the water on that basis, each party claiming and using the number of inches to which he was entitled under whatever head the dam at

The Janesville Cotton Mills and others vs. Ford and another.

the time afforded; they have entered into mutual agreements for measuring, and paid ratable contributions to an engineer for regulating the use on that basis; they have, in connection with other owners of water-powers on Rock river at Beloit and Rockford, constructed a reservoir dam at or near Koshkonong, by means of which the flow of water is regulated and the ordinary flow increased in dry seasons.

It seems plain that the excess of power has been in fact created by the purchasers of water rights, and, if it were necessary, it would not seem to be very difficult to hold that the primary owners and the appellants, who claim as grantees of the primary owners, are estopped at this period from claiming that this excess of power still belongs to them; but it is not necessary to invoke the principle of estoppel. When the primary owners had conveyed and reserved, in the aggregate, 13,532 square inches of water at a four-foot head, and exacted the covenants for repair and maintenance, they had undoubtedly conveyed the dam and the right to maintain it, because they had sold all the water the dam afforded, and compelled the grantees to maintain it. *Smith v. Ford*, 48 Wis. 115. Thereafter their only interest in the dam was as owners of the 3,200 inches of reserved water. And when, at a subsequent period, an owner of the perpetual right to use a definite quantity of water at a four-foot head, who was by virtue of such ownership, and of that alone, the owner of a proportionate share of the dam, deeded his rights to another, and exacted a covenant to maintain, we think it clear that he deeded the interest in the dam and power which he then had, whether he acquired that interest entirely by virtue of his original purchase or jointly by virtue of his purchase and his subsequent expenditures. We cannot divide the dam by a horizontal line at a point where it would furnish a head of four feet, and say that all above this line belongs to the primary

owners. The inequitable character of such a ruling is too plain to require further comment.

This disposes of the points raised and discussed by the appellants.

Chief Justice COLE took part in the decision of this action, as well as in the decision of the case of *Jackson Milling Co. v. Chandos, infra.*

*By the Court.*— Judgment affirmed.

CASSODAY and PINNEY, JJ., took no part.