### CUMMINGS & a. *v.* BLANCHARD.

The grantee of the right to take from a bulkhead and flume " the quan-tity of water which shall be discharged therefrom through an aperture of two hundred square inches at the gate under fifteen feet head" is enti-tled to the constant flow of that quantity and no more, in all stages of the water. The size of the aperture must be diminished or increased according as the head rises above or falls below fifteen feet.

In a suit to determine the rights of the parties under the grant, the grantor is entitled to a decree requiring the grantee to construct a gate at the aperture with a gauge thereon that will at any given head render an infringement of the grantor's rights visible on inspection.

The head is to be measured with the water at rest in the flume.

Usage is not admissible to contradict a written contract unambiguous in its terms.

BILL IN EQUITY, in aid of a suit at law, for the establishment of the respective rights of the parties to the use of the water-power on the east side of Ammonoosuc river in Lisbon village; for a decree establishing where and how the defendant's right shall be measured, and for an injunction restraining him from using water in excess of, or in a manner different from, his right so established; also for the ascertainment and apportionment among the plaintiffs of the damages occasioned by the defendant's infringement of their rights. Hearing before *Bingham*, J., who reported the case for the determination of the whole court in substance as follows:

The parties own the entire water-power on the east side of Ammonoosuc river in Lisbon village, having one dam, pond, and bulkhead. The defendant has the first right, limited to a certain quantity of water to be taken from the bulkhead and used on what is called the old factory site, one hundred and fifty feet below. Four of the plaintiffs have the second right; James G. Moore, one of the plaintiffs, has the third right; and Ovid D. Moore, the

other plaintiff, the fourth right,—to the use of the water for operating their respective mills, each right being subject to the prior rights in the order named. No question is made between the owners of the second, third, and fourth rights but that each right has been duly used.

June 22, 1866, the title to the defendant's mill-site with all the water-rights on the east side of the river was vested in William H. Cummings, Jonathan H. Bowles, and Jonathan K. Atwood. On that date Cummings conveyed to Bowles and Atwood all of his undivided third part of the mill-site and of the water-power belonging to the same, reserving of the water-power his third "of all in excess of the two hundred square inches which is to be deeded by the grantees hereof to Nelson Howe and B. F. Martin, as specified in their said deed of this date." At the same time and as part of the same transaction, Bowles and Atwood conveyed to Howe and Martin the mill-site now owned by the defendant, and "all the right of taking from our bulkhead and flume the quantity of water which shall be discharged therefrom through an aperture of two hundred square inches at the gate under fifteen feet head, in preference to all other rights of water whatsoever, and a proportionate right and interest in the main dam and dams by the mill, . . . the said grantees to be at one third of the expense of keeping the dams aforesaid in repair and of rebuilding the same." There was at the time of this conveyance no mill, and for seventeen years there had been none, on the mill-site conveyed. No use had been made of the site or water-rights during that period. At the time of the conveyance it was understood by the parties to the deed that the site was to be used for mill purposes, and that the grantees intended to erect immediately, and they forthwith did erect and operate for ten years, a mill for crushing gold-bearing quartz. When the defendant purchased the property, January 5, 1886, he changed the mill to one for grinding grain.

A breast wheel was used in the mill that stood on the mill-site prior to 1849. Howe and Martin put in a scroll wheel, built on the turbine principle, with a gate before the wheel; and this wheel was used until replaced by a Hercules wheel, put in by the defendant in the summer of 1886. This is also a turbine wheel with a gate before it, which measures the water passing through it. The plaintiffs do not object to the principle of the wheel, but to its size. They insist that it is too large,—its eighteen apertures, nine and one half inches by one and one half inches in size, measuring two hundred and fifty-six and one half square inches at the gate. The apertures in the scroll wheel put in by Howe and Martin measured two hundred square inches. The defendant at first put in set screws that prevented the raising of the gate higher than was sufficient to open an aperture of two hundred square inches, measured at the gate before the wheel. When business pressed

and more water was needed the screws were left out, and a mark was made to indicate the two hundred square inch point. Later this was disregarded, and the use of water to the extent of the capacity of the wheel became the rule rather than the exception.

The defendant's penstock is attached to the bulkhead of the flume, and was out of repair, wasting from one sixth to one fifth of the water passing through it from 1886 to 1889, when it was replaced by a new one. At the bulkhead there is a large gate by which the flow of the water can be regulated or entirely cut off, but it is imperfect and difficult to operate, and has seldom been used. The flow of the water from the pond and into the wheel has practically been controlled by the gate at the wheel.

Tub, breast, and overshot wheels retard the flow of water very little,—some four per cent. Centre-vent, scroll, and wheels generally, built on the turbine principle, retard the flow much more, on the average about forty per cent., so that only six tenths of the water will pass through a gate opening into a turbine wheel that would pass through wheels operated under substantially a free flow.

If the Bowles and Atwood deed is construed as conveying the quantity of water that will pass through a two hundred square inch hole at the gate with a free flow under fifteen feet head, or under a head that would be fifteen feet with the water at the opening in the bulkhead at rest, then the defendant has not drawn so much water, including the leakages, as his deed conveys to him; and he is not liable, unless for allowing the water to run through his wheel at night to prevent it from becoming frozen. This use of the water kept the pond from filling during the night, and delayed and injured the plaintiffs in the use of their mills during the day.

One reason for the turbine taking the place of the free-flow wheel was economy in the use of water. The head in the flume near the opening in the bulkhead with water at rest is drawn down a foot or more by opening the flow into the defendant's wheel. This fall is owing to the suction of the water through the hole in the bulkhead into the defendant's penstock, which falls rapidly to the gate. The plaintiffs claim that the fifteen feet head is to be taken in the pond with the water at rest in the bulkhead.

The claim of the defendant is, that only about sixty per cent. of the water that would pass through an aperture of two hundred and fifty-six and one half square inches with a free flow will pass through his wheel, owing to the retardation of the water in passing through it; and that his deed conveys the water that would be discharged through a two hundred square inch hole under a head of fifteen feet with a free flow, or with the water moving without retardation, which would require a twenty-five-inch Hercules wheel with apertures amounting to three hundred

and twenty square inches to pass that quantity of water moving with the retarded motion caused in passing through the wheel.

As bearing upon the construction of the Bowles and Atwood deed, evidence was received from the plaintiffs, subject to exception, of the uses to which the factory site had been and was proposed and understood by the parties to be devoted. Also as bearing upon the construction of the deed, the plaintiffs put in evidence, subject to exception, that there was a local understanding in Lisbon and vicinity among mill-owners, known to the parties, as to the meaning of the phrase "at the gate;" and it was found that the words were understood to mean the gate before the wheel and not the opening at the bulkhead, and to call for a measurement of the water in motion as it is retarded by its passage through the wheel; and that this was known to the parties to the deed.

If the defendant is liable for damages, they are assessed to the plaintiffs owning the second right at $250, to James G. Moore at $50, and to Ovid D. Moore at $500. If liable only for allowing the water to go to waste at night, the damages are assessed to the plaintiffs owning the second right at $25, to James G. Moore at $5, and to Ovid D. Moore at $25.

*Edgar Aldrich* and *Harry M. Morse*, for the plaintiffs.

*Chase & Streeter*, for the defendant.

SMITH, J. Under the deed from Bowles and Atwood to Howe and Martin, the defendant has the right to take from the "bulkhead and flume the quantity of water which shall be discharged therefrom through an aperture of two hundred square inches at the gate under fifteen feet head."

Reported cases upon conveyances of water-power show great numbers of controversies arising from the methods adopted by grantors and grantees for ascertaining the quantity of water or power conveyed. The quantity is often described as a capacity to do specified work, or is to be found by tests otherwise open to contention. *Johnson* v. *Rand*, 6 N. H. 22; *Whittier* v. *Cocheco Mfg. Co.*, 9 N. H. 454; *Dewey* v. *Williams*, 40 N. H. 222; *Bullen* v. *Runnels*, 2 N. H. 255, 262; *Loverin* v. *Walker*, 44 N. H. 489, 491; *Saunders* v. *Newman*, 1 B. & Al. 258. A great variety of phrases are used in such conveyances, that leave the amount of granted or reserved power to be ascertained by experiment or scientific computation. In many cases the quantity of water actually taken at any one time is not apparent upon inspection, and can only be determined by measurements together with difficult and laborious calculations.

All difficulties of this kind the parties to the deed of 1866 attempted to avoid by precise and carefully selected language

intended to preclude doubt and litigation. They used expressions that required the construction, maintenance, and use of a conduit and gauge, with a necessary and incidental right of reasonable inspection that would render an infringement of the grantors' rights visible without measurement or computation.

If the height of the water in the plaintiffs' bulkhead and flume were uniform at all seasons, the apparent intention of the parties could easily be carried into effect. "The quantity of water which shall be discharged therefrom through an aperture of two hundred square inches at the gate under fifteen feet head" would not be the quantity that could be discharged through more than one aperture, nor through a larger aperture than two hundred square inches, nor under a greater head than fifteen feet. And the plaintiffs would be entitled to a decree requiring the defendant to construct his works in a form that would give him no means of drawing water through a larger aperture or under a greater head. But the height of water in the bulkhead and the flume is not uniform. It varies as the amount of rain-fall varies in wet and dry seasons. An aperture of exactly two hundred square inches under fifteen feet head in low water would in high water give the defendant more power than was granted by the deed. So an aperture of that size under fifteen feet head in time of flood would give him in time of drought less than was granted. Because the head varies from time to time, a fixed aperture of exactly two hundred square inches will give the defendant more or less than the granted quantity, according as the head is greater or less than fifteen feet. Hence, in order that the defendant may at all times have a power equivalent to a stream of water discharged through an aperture of two hundred square inches under fifteen feet head, the aperture must be enlarged as the head falls, and diminished as it rises.

At the hearing evidence was received on the irrelevant issue of the local meaning of the words "at the gate." Incompetent evidence was received of the uses to which the parties understood the premises were to be put. Usage is admissible to explain what is doubtful, but not to contradict what is plain. 1 Gr. Ev., s. 292. It is not admissible to control a written contract unambiguous in its terms. *Potter* v. *Smith,* 103 Mass. 68; *Davis* v. *Galloupe,* 111 Mass. 121; *Hedden* v. *Roberts,* 134 Mass. 38. At the date of the deed there was no mill on the factory site, and had been none for seventeen years; and the only gate was in the bulkhead or flume.

The deed of 1866 provides for a gate at the aperture, but does not restrict the size of the gate or the size of the wheel. It is for the defendant to determine how large the gate and wheel shall be, how many apertures there shall be in the wheel and their size, and all details of the structure of the wheel. The essential limitation is, that the water he uses shall be discharged before he uses it through an orifice not larger than two hundred square inches

under a head of fifteen feet, or its equivalent under a greater or less head. With all the water so obtained he can do what work he pleases in his own way. All the power he loses through wasteful wheels is his loss; all of it that he saves by improved wheels is his gain. *Bullen* v. *Runnels,* 2 N. H. 255, 266; *Dewey* v. *Williams,* 40 N. H. 222; *Saunders* v. *Newman,* 1 B. & Al. 258. He has every inducement to adopt the mechanical inventions that will obtain the greatest power from a stream discharged through an orifice of the size and under the head fixed in the deed, or its equivalent.

Counsel have argued the question whether fifteen feet head means with the water at rest at the bulkhead, or in motion through the defendant's penstock. From the terms of the deed, executed when there was no mill or penstock on the premises, we infer the parties meant that the grantees' power should be ascertained and set out by measuring from the top of the water at the bulkhead, at rest, till they had a difference of level of fifteen feet.

No evidence was offered to show a latent ambiguity in "head," to be removed by parol evidence; and without any parol evidence on that subject (on the competency of which we express no opinion) we think the parties meant to measure the head when the water was not running through the grantees' penstock, and when there was no penstock there, taking the measure to determine where the penstock should be built and where the aperture should be located. One reason for inferring that this was the intention is, that the water at rest might give a more certain and easily ascertained point to measure from than the uneven surface of the water at the upper end of the penstock when the water is in motion.

At the trial term a commissioner, expert in such matters, must be appointed to determine the location and size of the aperture, and the height to which the gate must be raised at different stages of the water to give the defendant the quantity of water to which he is entitled under the deed. The height to which the gate shall be raised as the level of the water varies should be plainly indicated by marks or figures upon some permanent part of the gate fixtures, open at all times to the inspection of the plaintiffs, that they may readily determine by observation or mere inspection whether the defendant is drawing the quantity of water to which he is entitled, and no more.

The plaintiffs are technically the prevailing party in the equity suit; but as the defendant with his present wheel has not used more water, including the leakages of the penstock, than he would or could have used if it had been drawn through an aperture of two hundred square inches under fifteen feet head before it was used to turn his wheel, no damages can be recovered on that account: nor can the plaintiffs recover damages for his allow-

ing the water to go to waste at night. Neither party is entitled to costs.

Case discharged.

CARPENTER and CHASE, JJ., did not sit: the others concurred.