VERMONT SHADE ROLLER CO. *v.* BURLINGTON TRACTION CO. ET AL.

November Term, 1930.

Present: POWERS, C. J., SLACK, and THOMPSON, JJ., and SHERMAN, Supr. J.

Opinion filed February 13, 1931.

294

*Marvelle C. Webber* for the petitioner.

*Chas. H. Darling* and *Guy M. Page* for the petitionee.

THOMPSON, J.   This is a petition for a rehearing in the above entitled cause brought by the plaintiff under the provisions of G. L. 1567-1570.   At the May Term, 1930, this Court, after full hearing, reversed the decree of the court below, and remanded the case with mandate that there be a new decree in accordance with the views expressed in the written opinion. See this case, 102 Vt. 489, 150 Atl. 138.

The plaintiff contends that this Court erred in holding that "the decree should further provide that the defendant may install and maintain iron gates or openings at the bottom

of the plaintiff's flume or bulkhead by which to determine the amount of water the plaintiff has the right to use under the terms of the Clapp Agreement, and may enter the premises of the plaintiff to determine the amount of water being used; all this as provided by the terms of the Clapp Agreement of 1872; and, also, that this Court erred in holding on the findings by the chancellor "that the quantity of water to which the plaintiff, its successors and assigns, are entitled under the Clapp Agreement of 1872 is as much water as will pass through openings each ten inches square with square edges at the head of fifteen and one-tenth (15.1) feet at the top of the new dam."

We consider the latter contention first. The plaintiff argues that the fact to be inferred to support the decree below is not that the parties to the Clapp Agreement had in mind when they executed it that Clapp's quota of water might be measured by openings with rounded edges; but that the decree giving the plaintiff the greater efficiency of discharge through openings with rounded edges is sustained by the finding "that in 1872 the rounded orifice was known and in general use"; that because of this finding, and the findings that orifices with rounded edges might be indicated by the description "two openings each ten inches square," and that two such orifices will discharge about forty cubic feet of water per second, the plaintiff is entitled as a matter of law to the greater efficiency by the terms of the Clapp Agreement; and that it is not necessary to draw any inferences from the facts found to support the decree. The plaintiff cites and relies upon *Janesville Cotton Mills* v. *Ford,* 82 Wis. 416, 52 N. W. 764, 767, 17 L. R. A. 564, and *Dexter Sulphite P. & P. Co.* v. *Jefferson P. Co.,* 179 App. Div. 332, 166 N. Y. S. 311, 312, in support of this contention.

The plaintiff says that it made this contention at the first hearing; but this is not so, and the cases which it relies upon now were not cited in its brief. The plaintiff contended then that the Clapp Agreement was a grant or conveyance of water power and invoked the rule that in a case of doubt a grant will be construed most strongly against the grantor and in favor of the grantee, and it cited cases where it has been held that, as between two methods of measuring the quantity of water granted, the method giving the larger quantity to the grantee will ordinarily be taken as intended by the grant. But we held that the Clapp Agreement was not a grant or conveyance, and

that its words are to be construed as the language of both parties and shall not be taken most strongly against one or beneficially for the other.

The general rule is that on a petition brought under the statute a rehearing will not be granted for the purpose of affording opportunity to present new questions. *Van Dyke* v. *Cole,* 81 Vt. 379, 399, 70 Atl. 593, 1103; *Cunningham* v. *Blanchard,* 85 Vt. 494, 501, 83 Atl. 469; *City of St. Albans* v. *Avery,* 95 Vt. 249, 265, 114 Atl. 31. And no reason has been presented why we should depart from the rule in this case. We will say, however, that we have examined the cases cited by the plaintiff, and they do not support its contention.

In *Janesville Cotton Mills* v. *Ford,* one of the questions was the meaning of the term "square inch of water" as used in certain grants of water power: The plaintiff claimed that the term had a definite, technical meaning among water engineers and practical mill men from a time anterior to the making of the first conveyance, and that such meaning was a stream of water with a cross section area of one square inch, moving with the velocity due to the given head. This is called the "theoretical inch." The defendants denied that the term had such a definite, technical meaning, and claimed that on the evidence it meant the amount of water which would pass through an aperture in a flume of the given number of square inches under a given head. This is called the "practical inch," and when discharged through an aperture with square edges it measures about sixty-two per cent. in volume of the theoretical inch, but if the aperture be trumpet shaped, or furnished with proper ajutage inside the reservoir, it may be made to equal the theoretical inch, and even to discharge as much as 240 per cent. of the theoretical inch.

The court said in its opinion: "It needs no authority to show that if the term had a fixed and definite meaning among hydraulic engineers and mill men at the time it was used, such meaning would prevail, notwithstanding the fact that people ordinarily would not know such meaning, or even that the parties to the deeds themselves did not know it. Parties cannot use technical terms with fixed meanings and then disclaim such meanings." The plaintiff in the instant case relies upon this quoted portion of the opinion in support of its contention, and says: "Hence if the rounded orifice was known to the

profession of engineers and to mill men, parties would be bound, notwithstanding the fact that they personally did not know or have in mind such orifice." But the court further said that when such alleged technical or trade meaning is an arbitrary one, and not a meaning that the word or words would naturally import, it must clearly appear that the acquired or technical meaning was not the subject of dispute or doubt, and that it was well settled and understood at least among members of the profession or trade which is supposed to use the term in such technical sense.

If there had been a finding in the instant case that the term "opening ten inches square," as used for measuring water at the time the Clapp Agreement was executed, had acquired among hydraulic engineers and practical mill men the definite, technical meaning of an opening with rounded edges to the exclusion of an opening with square edges, it might be said that this case supports the contention of the plaintiff; but there is no such finding. In fact the findings are the other way, as the chancellor found that either an orifice with rounded edges or an orifice with square edges may be indicated by the description "two openings each ten inches square"; and the question still remains as to which type of orifice the parties to the Clapp Agreement had in mind when they executed it.

In *Dexter Sulphite P. & P. Co.* v. *Jefferson P. Co.*, the defendant's right, as determined by a former judgment, was to use as much water from a certain pond "as will pass through an aperture three feet square under all the head that can be obtained, to be taken from the south end of the north dam through a well-secured and tight flume or bulkhead." The referee found that the defendant's water should be measured at the dam through an aperture three feet square with square edges. The defendant claimed that it was entitled to use the full theoretical discharge through an aperture three feet square, to be measured by the discharge of its water wheels. The court sustained the finding of the referee.

The plaintiff relies upon two sentences of a paragraph in the opinion of the court. We quote the whole paragraph, the sentences relied upon by the plaintiff being in italics. "But it is urged that, if an aperture is to be prescribed, it should not be limited to the form prescribed. The referee has held that the form prescribed was 'practically a standard orifice, and its

character presumably known to hydraulic engineers,' at the time of this grant in 1842; that the grant as construed in the decree of 1898 calls for a square opening; and that when used as a means of measurement of water without qualification, should be construed to refer to that kind of a square orifice which is the most definite and certain in its results. *It appears that by rounding the edges of the orifice the contraction of jet is avoided, and the amount of discharge increased possibly to unity or the full theoretical discharge. But the learned referee was of opinion that this form of orifice could not have been in the contemplation of the parties to the deed in 1842; it not appearing that at that time such a form was in use for the measurement of water.* He was also of the opinion that to round the edges of the orifice would introduce an element of indefiniteness and uncertainty.'' The court said further: ''There is no doubt upon the evidence that the form of aperture prescribed affords a means of measurement definite and certain in its results, as is well understood by hydraulic engineers and manufacturers of water wheels. There was evidence, which the referee evidently accepted as true, to the effect that there is an established practice among hydraulic engineers that, where water is allowed through apertures, it is to have rectangular openings with sharp edges.''

The plaintiff asks us to infer that if the referee had found that in 1842 orifices with rounded edges were in use for the measurement of water, the court would have held that the defendant was entitled to have its water measured through such an orifice. In view of the finding of the referee that a square orifice with square edges is the most definite and certain in its results, and that to round the edges of the orifice would introduce an element of indefiniteness and uncertainty, we think such an inference cannot be fairly drawn.

The substance of what the referee held and the court said is that there is an established practice among hydraulic engineers that, if a square aperture is prescribed as the means of measurement of water without qualification, it means an aperture with square edges.

In our disposal of the case we did not consider any of the exceptions taken by the parties, but construed the Clapp Agreement in the light of the attendant circumstances as disclosed by the findings, and held as a matter of law on the findings that

the plaintiff is entitled under the Agreement to as much water as will pass through two openings each ten inches square with square edges under the determined head.

Since the petition for a rehearing has been brought we have further examined the record, and find that, before the finding of facts was completed, the plaintiff requested the chancellor to find that it is entitled under the Clapp Agreement to draw forty cubic feet of water per second, except when properly limited under the terms of the Agreement to one opening, and then it is entitled to draw twenty cubic feet per second. This was equivalent to a request to find that the plaintiff is entitled under the Agreement to use as much water as will discharge through openings with rounded edges, as it is only through an opening ten inches square with rounded edges that twenty cubic feet of water per second will discharge. The chancellor refused to comply with this request. Since he refused to find the essential fact, *i.e.*, that the parties to the Clapp Agreement contemplated that the water Clapp had the right to use should be measured through openings with rounded edges, we cannot presume, in support of the decree below, that he inferred this fact. *Dunnett et al.* v. *Shields et al.*, 97 Vt. 419, 429, 123 Atl. 626; *Fife* v. *Cate*, 84 Vt. 45, 48, 77 Atl. 947.

The defendant requested the chancellor to find that at the time the Clapp Agreement was executed, and at the present time, the "standard sort of orifice" for measuring water is a square-edged opening; that this is a well-established standard and was in use generally in the vicinity. The defendant excepted to the chancellor's refusal to comply with this request.

It also excepted to the finding that at the time the Clapp Agreement was executed in 1872, there were and there are at the present time in general use two types of orifices for measuring water; one type being a square-edged orifice, and the other type being a rounded or bell-mouth orifice; and that either type may be indicated by the description "two openings each ten inches square." The grounds of the exception are that there is no evidence that the rounded orifice was "in general use"; that the evidence is that the square-edged orifice was "the standard type for measuring water"; that it was the type found in hydraulic construction in Vermont, and the round-edged orifice was not so found in Vermont; that the evidence

does not support the statement that either type may be indicated by the term "two openings each ten inches square."

The defendant further excepted to the finding of the chancellor that he was unable to find that the two iron gates ten by ten inches square with square edges, installed in the bottom of Clapp's flume or wheel box about 1872 were ever used for measuring Clapp's quota of water, on the ground that, if the finding means anything other than that it was not established that any one on any particular occasion ever used the gates for measuring the water, it is not supported by the evidence.

It goes without saying that if there is no evidence to support the findings excepted to relative to orifices with rounded edges, there is no evidence to warrant a finding that the parties to the Clapp Agreement contemplated that the water Clapp had the right to use should be measured by openings with rounded edges, and without evidence to warrant such a finding, the decree below cannot be sustained. *Valentine* v. *Connor*, 40 N. Y. 248, 100 A. D. 476.

In view of the importance of this essential fact, and to prevent an injustice being done to either party, we have decided to consider these exceptions of the defendant, and, if necessary, will remand the case for an express finding, but only upon the testimony already in, as to the type of orifice contemplated by the parties to the Clapp Agreement to be used in measuring the water Clapp was entitled to use.

It fairly appears from the evidence and the findings not excepted to that, when the Clapp Agreement was executed, Clapp was building a new factory where the plaintiff's factory now stands. He began manufacturing shade rollers in the new factory in the spring or summer of 1873. His power was furnished by two water wheels. In 1874 he installed a new turbine water wheel where one of the old wheels had been located, in place of the two old wheels. At the same time he improved his tailrace by deepening it. When the new wheel was installed, it was at the same elevation as the former wheel, and located about, but not lower than, sixteen feet below the top of the dam. The tailrace was improved and the wheel installed according to the directions of Mr. Clapp and Herrick Stevens who represented the Vergennes Water Power Company. Mr. Stevens was present nearly every day while the work was going on. Clapp was present occasionally while the tailrace was

being improved, but he had a man in charge of that work who was present all of the time. The wheel was installed under the direction of Mr. Clapp and one John Flanders who had a machine shop in Vergennes, and, among other things, manufactured and installed water wheels.

One William H. Lang, then a young man, but who later became a hydraulic engineer of wide and varied experience, worked for Mr. Flanders from 1869 to 1879, and during that time worked on all or nearly all of the water wheels and powers taking water from the flume or canal of the water power company. He helped install the new wheel in 1874. He was a witness for the defendant in a former suit between these same parties. He died before the hearing below, and his testimony given in the former suit was read into the case.

It appears from the testimony of Lang and other witnesses that the flume or canal from which Clapp and other manufacturers took their water for power purposes, had no spillway or wasteway at its lower end, and consequently the water had to be throttled down at the upper end at the dam to the average flow required to supply the wheels taking water from the canal; that if a wheel was shut down, "a trig or plug of some kind would be put into the gear or into the pulley so that the same, or substantially the same, volume of water would be discharged through the wheel whether standing or running." This prevented the water from setting back into the canal and overflowing and damaging its banks when a wheel was not running.

The chancellor found that about 1872 two iron gates, each ten inches square with square edges, were installed in the bottom of Clapp's flume or wheel box. The evidence shows that these gates were installed in 1874, when the new wheel was installed.

In the direct examination of Mr. Lang the following questions were asked and answers received: "Q. At the time this wheel was installed in the Clapp wheel house were there any gates or openings placed near it for the purpose of measuring water? A. Yes, sir. Q. State how many there were, and describe them?" This question was objected to on the ground that the subject-matter "is all covered by a written agreement between the parties, and whatever was there at that time would be controlled by the agreement." The examiner then read from the plaintiff's (same plaintiff as in instant case) bill of

complaint in which it was alleged that the openings prescribed in the Clapp Agreement for measuring Clapp's quota of water were never installed, and said: "I propose to show that these openings were there and that they were installed in pursuance of this agreement." The answer was received subject to the objection and exception that it was immaterial. This was the only exception taken by the plaintiff to Mr. Lang's testimony.

The witness then testified in substance that the turbine wheel installed in 1874 was called a register gate wheel; that it required an "open setting," that is, it was not a "cased wheel," but was set directly in the center of a rectangular flume of sufficient dimensions to allow the spaces for water; that the main gate which controlled the flow of water on to the wheel, was on the wheel itself. The two iron gates ten by ten inches square were placed in the bottom of the wheel box beside the wheel; they had nothing to do with the control of the wheel; they would not only measure the water, but would answer the purpose of waste gates, and were connected to the main gate that controlled the flow of water onto the wheel. "It was purely a mechanical device to attach the stems of these waste gates to the main gate, so that when the main gate was open the same action would close the waste gates, and the reverse when the reverse action was taken. That eliminated the possibility of an operator forgetting to open the waste gate when the main gate was closed."

When this testimony was read into the instant case, the plaintiff was allowed the same objection and exception taken by the plaintiff in the former trial, and the further objection and exception that "the location of that old measuring device is not in issue in this case so that it is not at all material, here." In view of the fact that the plaintiff's witness Nightingale had already testified that two openings each ten inches square with rounded edges would discharge forty cubic feet of water per second, and the plaintiff was claiming it was entitled to that amount of water under the Clapp Agreement, this evidence was admissible as tending to show the practical construction given to the Agreement by the parties to it themselves.

Mr. Lang did not know whether the iron gates were used for measuring the water used by Mr. Clapp, as that was no part of his business, and he knew nothing about the arrangement between the water power company and Mr. Clapp as to

that. He testified that the gates were "readily adapted" for measuring the water, "answering the two purposes with one set of gates." A short time after the gates were installed, a wooden penstock was placed in the canal, and there was no necessity then for using the gates as waste gates, but this did not affect their function as a means of measuring the water.

In cross-examination, Lang testified that measuring water through square openings is the most accurate method used to-day for measuring water. He was asked: "Will you please state how the water could be measured by those two ten-inch openings?" and he replied: "With a given head of water, a ten-inch, or any other sized orifice made of a certain size and a certain description, the amount of water discharged through that opening is reduced down to a scientific measurement that will determine just the amount of water that will go through the hole as close as you can measure it with a bucket; the formula for that is not upon theory, but the coefficient use of that measurement has been demonstrated by actual practice." He further testified that under a sixteen-foot head six-tenths of one hundred square inches of water will pass through an opening ten inches square; and that the gates installed in the wheel box "corresponded very closely with the typical openings that are used today to determine the passage of water through an orifice." Near the close of his testimony he described the method by which to determine accurately how much water would pass through two openings each ten inches square, under a certain head. He was then asked: "And that is the way you understand the two ten-inch openings were put in there to measure it—in some such way as that?" and he replied: "That is the purpose they were put in there for, and no other."

It appears that Deft's Ex. H was an old rectangular iron gate with square edges taken from the flume or wheel box of the Haviland plant, which took its water from the flume of the water power company; that gates of this type were in general use for measuring water at the time the Clapp Agreement was executed in 1872 and at the present time. This exhibit is hereafter referred to as the Haviland gate. The chancellor found that the two iron gates installed in the bottom of Clapp's flume or wheel box were of the type of the Haviland gate, except as to size of openings.

Carl B. Brownell, Frank H. Crandall, and H. M. McIntosh, civil engineers with experience with water powers, testified for the defendant. It appears from the testimony of Mr. McIntosh that he had seen old and recent installations of water gates for measuring water; that the earlier gates were all of iron, "framed with a solid running in 'guides'"; that he had seen several of the earlier gates of the type of the Haviland gate; that he remembered seeing gates with square edges, but not one with rounded edges; that the gates he had seen in place were in the flume as a head gate. The testimony of Mr. Crandall is similar to that of Mr. McIntosh. Mr. Brownell testified that the tables in the books dealing with hydraulics giving the discharge through orifices are generally based on an orifice "with a square corner inside"; that such an orifice "is the standing sort of orifice for measuring water"; that it is a well-established orifice; and there has been no recent changes in the art of measuring water through orifices. There is no evidence in the case that rectangular orifices with rounded edges were ever installed or used in Vermont for measuring water, or that such an orifice was ever known to practical millmen, or outside of the engineering profession.

After the case was closed, with the exception of taking certain testimony which is not material here, the chancellor made his tentative finding of facts, and found, as to orifices: "At the time the contract of 1872 was made and at the present time the standard type of orifice for measuring water is a square-edge opening. This is a well-established standard and was in use generally in the vicinity. The original gates installed about 1872 were of this type and such a one (Defendant's Exhibit H) was produced from the Haviland plant." We have carefully examined the record and are of the opinion that this is the only finding that was warranted by the evidence then in the case.

▆ Several months after the tentative finding of facts was made the chancellor granted the plaintiff's request for opportunity to introduce further evidence; and Mr. Nightingale, plaintiff's engineer, testified as follows: "*Mr. Webber:* Q. Was the rounded orifice, so-called, known to the profession and in use prior to 1872? A. Yes, as a means of measuring and transmitting water, as a means of measuring water in 1784; they begun to make experiments to determine the coefficiency of

water flowing through a rounded orifice, the orifice being either round or square. *The Chancellor:* Q. When you say 'rounded orifice,' do you mean the type introduced in evidence at the other hearing and marked as an Exhibit? A. There was a sketch; no model or a round edged orifice, but a sketch. *Mr. Darling:* Q. You refer to the rounded edge, rather than the circular portion of the orifice. A. Yes; a rounded edge; rounded on the inside to the outside of the discharge. *The Chancellor:* Q. You mean in the type you now speak of, that it could be described as a conduit for conducting water as an orifice ten inches square? A. Yes; it could be described as an orifice ten inches square. *Mr. Webber:* Q. And was that the sort of orifice you referred to when you testified before that it would discharge about 90 per cent. of efficiency? A. It was. *Mr. Webber:* That is all. No cross-examination.''

It was after the chancellor had considered this testimony of Mr. Nightingale that he changed his finding as to the square-edged orifice being the standard type of orifice used for measuring water, and found that at the time the Clapp Agreement was executed and at the present time rounded or bell-mouthed orifices were and are in general use for measuring water. In our opinion the testimony of Mr. Nightingale does not support this finding. The only finding that it could warrant is that prior to 1872 the round-edged or bell-mouthed orifice was known to hydraulic engineers ''as a means of measuring and transmitting water,'' and was in use prior to 1872, and that such an orifice ''could be described as an orifice ten inches square.'' There being no evidence that, at the time the Clapp Agreement was executed, orifices with rounded edges had ever been used in Vermont or in the vicinity for measuring water, or that they were known to practical mill men, this testimony could not support a finding or even an inference that it was contemplated by the parties to the Clapp Agreement that Clapp's quota of water might or should be measured through openings with rounded edges. There is nothing in Mr. Nightingale's testimony that warranted the change in the tentative finding.

The chancellor found that the ''two iron gates were so placed in the bottom of the flume or wheel box as to be used automatically as flood or waste gates to protect the canal banks and were used for that purpose; also they might have been

used as measuring gates, but I am unable to find that they were ever used for that purpose.''

It might be fairly inferred from this finding that the gates were to be used primarily as flood gates, and secondarily, if at all, for measuring Clapp's quota of water; but according to the terms of the Clapp Agreement, the reverse is the fact. The Agreement provides that the water power company shall place gates at the bottom of Clapp's flume by which to determine the amount of water he had the right to use, and they ''may also be used as flood gates and may be attached automatically to the wheel gate of said Clapp.''

The work done on Clapp's water power in 1874 was under the direction of the parties to the Clapp Agreement. The parties agreed at the trial below that Clapp's tailrace was improved and the turbine wheel installed according to the provisions of the Agreement. The only disagreement then was as to the head of water the plaintiff was to have. The two iron gates were placed in the bottom of the flume at the time the wheel was installed, and under the same direction and supervision. The material and dimensions of these gates and their location in the flume and attachment to the water wheel gate were in strict conformity to the provisions of the Agreement. It is true that it does not appear that they were ever used for measuring the water, but, as we said in the opinion (102 Vt. 505, 150 Atl. 145), that is not strange.

We think that, in the absence of such evidence, the installation of the gates by the parties to the agreement so soon after its execution and in such strict conformity to its provisions, is a controlling circumstance in determining the proper construction of the Agreement. It is a circumstance which partakes of the nature both of an attendant fact and a practical construction by the parties to the agreement. It was a practical demonstration that the parties meant by the term ''two openings each ten inches square,'' openings with square edges. *Jackson Milling Co.* v. *Chandos,* 82 Wis. 437, 453, 52 N. W. 759.

We said in the opinion that, if nothing appeared to the contrary, we would violate no rule of construction in holding that the ordinary acceptation of the term ''two openings each ten inches square'' is openings with square edges. This statement is supported by the authorities, as it has been held gen-

erally that where the prescribed method of measuring water is through simple, rectangular orifices of a certain superficial area, it means orifices with square edges. *Dexter Sulphite P. & P. Co.* v. *Jefferson P. Co., supra; Jackson Milling Co.* v. *Chandos, supra; Schuylkill Navigation Co.* v. *Moore,* 2 Wharton (Pa.) 477, 491.

The defendant's exceptions to the findings and to the failure to find as requested, which we have considered, are sustained, and the case will be remanded for further findings, but only upon the testimony and exhibits already in, as to the type of orifice contemplated by the parties to the Clapp Agreement to be used in measuring the water Clapp was entitled to use under the terms of the Agreement.

█ The plaintiff says, relative to our holding that the decree should provide that the defendant may install gates, etc., in the plaintiff's flume, that the defendant did not ask for the installation of such gates nor did it raise the question in its cross-bill, and that neither the findings nor the decree show that any such right was claimed or raised below.

It is true that neither this question nor the question of the type of orifice the parties to the Clapp Agreement contemplated might be used in measuring the water the plaintiff is entitled to use are raised directly by the pleadings; but both questions were raised below and considered by the chancellor. It appears from the record that while the decree was in a tentative form, the defendant requested the chancellor to modify it so as to permit the defendant to install gates in the bottom of the plaintiff's flume or bulkhead by which to determine the amount of water the plaintiff has the right to use, and that both parties filed briefs on this question with the chancellor. The decree, being adverse to the defendant on this question, impliedly overruled the request, and the question is before us on the appeal. *Davis* v. *Union Meeting House Society,* 92 Vt. 402, 105 Atl. 29; *Gray* v. *Brattleboro Trust Co.,* 97 Vt. 270, 122 Atl. 670.

Both parties rely upon the terms of the Clapp Agreement as to their rights regarding the amount of water the plaintiff has the right to use. The amount of water the plaintiff has the right to use and the head under which it shall be measured has been determined. The Agreement also provides that Clapp, his heirs and assigns, shall permit the water power company, their heirs and assigns, to enter upon the premises and install their

gates for measuring the water and "determine the amount of water being used by R. M. Clapp, his heirs and assigns."

■ One of the grounds for equitable relief set forth in the plaintiff's bill of complaint is to avoid a multiplicity of suits. The plaintiff's bill of complaint and the defendant's cross-bill both contain prayers for special relief by way of injunction and for general relief. The special relief was denied to both parties; and the decree below was rendered under the general prayer. It fairly appears from the record that the court below, with the consent of the parties, undertook to construe and determine the rights of the parties under the Clapp Agreement, and we think that the question of the right of the defendant to install gates in the plaintiff's flume to measure its water and determine the amount being used was well within the general frame and the general prayer of the bill and cross-bill and the case made thereon. *Fireman's Ins. Co.* v. *Butcher,* 102 Vt. 183, 189, 147 Atl. 267. It may be that the pleadings should be amended for the proper presentation of this question on the record, but that is a matter that can be passed upon by the chancellor.

■ In *Western Union Tel. Co.* v. *Bullard,* 67 Vt. 272, 280, 31 Atl. 286, 288, it is said, quoting from *Whipple* v. *Village of Fair Haven,* 63 Vt. 221, 21 Atl. 533, "* * * * * * it is a familiar rule that, when the court of chancery has jurisdiction of a case for one purpose, it will retain it for all purposes, and dispose of the whole matter. And this is a salutary rule, for it prevents litigation, and to end that is for the public good." This rule is particularly pertinent to the instant case, as the parties have been in litigation over the water power right defined and confirmed by the Clapp Agreement much of the time during the past fifteen years; and, considering the capacity of the plaintiff's water power layout to take and use a much greater quantity than it has the right to use, it seems to us that this question will inevitably be litigated later if it is not decided now.

In view of some of the questions raised by the plaintiff in its petition and some of the claims made by the parties in the hearings below, which were not called to our attention by counsel, but have been discovered by a further examination of the record, we think there should be further proceedings before the chancellor on this phase of the case; but there are a few suggestions we desire to make before the case is remanded.

310

■ ■ As we construe the Clapp Agreement, it does not define and confirm the right to use a certain amount of power, but the right to use a certain quantity of water in weight or bulk, *viz.*, so much water as will pass through openings each ten inches square under the determined head. With all the water thus obtained the plaintiff can do all the work it pleases in its own way, subject only to the restrictions placed upon such use by the provisions of the Agreement, and it may use the mechanical inventions that will obtain the greatest power from such a stream of water. *Dexter Sulphite P. & P. Co.* v. *Jefferson P. Co., supra,* 179 App. Div. 332, 166 N. Y. S. 311, 316; *Cummings* v. *Blanchard,* 67 N. H. 268, 36 Atl. 556, 68 A. S. R. 664; *Appleton Paper & Pulp Co.* v. *Kimberly,* 100 Wis. 195, 75 N. W. 889.

The defendant claimed below and claims now that the decree should permit it to install gates at the bottom of the plaintiff's flume or bulkhead by which to determine the amount of water the plaintiff has the right to use, as provided by the Clapp Agreement. The plaintiff says that the installation of its present wheel is such that it is impracticable, if not impossible, to install measuring gates in conformity to the provisions of the Agreement. The defendant cites cases where it has been held that where the grant was of so much water as would discharge through an orifice of certain dimensions located at a certain place, the mode of measuring the water prescribed by the parties themselves must control, and not some other method which the court may think to be expedient. *Drummond* v. *Hinkley,* 30 Me. 433; *Blanchard* v. *Doering,* 21 Wis. 477. In these cases the grantee was attempting to measure his water through an orifice different from the one prescribed by the conveyance.

It appears from the record that about 1878 the plaintiff's predecessor in title stopped taking its water from the flume or canal, and since then the plaintiff's water has been taken directly from the forebay with the full knowledge and acquiescence of the defendant and its predecessors in title. It also appears that about 1887 the plaintiff installed a new water wheel, and that its present wheel was installed about 1908. At some time the exact time not appearing, the two openings each ten inches square disappeared from the bottom of the bulkhead or flume, and there has been no measuring gates in the plaintiff's bulkhead or flume since then.

For many years prior to 1914 the plaintiff purchased fifty inches of water in addition to its rights under the Clapp Agreement from the defendant and its predecessors in title. It began purchasing this additional water December 1, 1881, and the first contract was for five years. The contract provided that said fifty inches of water were "to be taken from the same point and under the said head and subject to the same manner of measurement and conditions as stipulated in" the Clapp Agreement. It does not appear that any of said water was ever measured as provided by the Agreement, nor that the parties had any trouble about the quantity of water the plaintiff was using, or that the defendant insisted on its right to install measuring gates in the plaintiff's bulkhead or flume until after the defendant ceased selling said fifty inches of water to the plaintiff about 1914.

It appears from the record that the plaintiff's wheel will pass from sixty to seventy cubic feet of water per second, which is a much greater quantity than the plaintiff has the right to use, and that it has a Lombardy governor on its wheel which will automatically open the wheel gates when the load increases, and it has been set to open the wheel to its full capacity. It also appears that the defendant has a much larger intake than the plaintiff's, and the bottom of its intake is lower than that of the plaintiff's, and the defendant can draw the water in the forebay so that it will be below the plaintiff's intake; that it did so draw the water on many occasions which caused great fluctuations of the water in the forebay, with resulting injury to the plaintiff's plant and business.

The plaintiff claimed that these fluctuations of the water were caused wholly by the defendant drawing the water out of the forebay and below the plaintiff's intake in violation of its rights under the Clapp Agreement; but the chancellor was unable to find by the preponderance of the evidence that before and at the time the fluctuations occurred the plaintiff had not and was not using more water than it had the right to use under the Agreement; he did not find that the plaintiff did, but he could not find that it did not use the water; that the burden was on the plaintiff to show that at the time of the fluctuations it was observing the provisions of the Agreement, and it had not discharged that burden.

In view of this situation and of the right given to the defendant by the Clapp Agreement, we think the decree should provide that the defendant, its successors and assigns, may enter the plaintiff's premises and install measuring gates and determine the amount of water being used by the plaintiff, its successors and assigns, as provided by the Agreement; and, if that is not practicable, or if it would be inequitable to compel the plaintiff to make changes in its bulkhead or flume for the installation of such measuring gates, the chancellor shall determine by other means the quantity of water the plaintiff has the right to use under the terms of said Agreement, as herein construed, and shall determine, and provide for the installation of, a suitable device or devices for measuring the same.

We also think that the decree should provide further that, if the plaintiff uses no more water than it has the right to use under the provisions of the Agreement, and the defendant, without right, draws the water in the forebay down with a resulting loss of power to the plaintiff, the plaintiff shall have the right to draw additional water sufficient to compensate for the loss of head.

The cause will therefore be remanded on this phase of the case for further hearing upon the present evidence and such other evidence as the parties may present, and for findings and decree not inconsistent with the views herein expressed.

*Rehearing denied. Petition dismissed. Mandate recalled. Decree reversed, and cause remanded for further proceedings not inconsistent with the views herein expressed.*